622 So.2d 25 (1993)
Edmund D. WILSON, Appellant,
v.
The EQUITABLE LIFE ASSURANCE SOCIETY OF the UNITED STATES, a foreign corporation, and Sid W. Levy, an individual, Appellees.
No. 92-01782.
District Court of Appeal of Florida, Second District.
July 2, 1993.
Rehearing Denied August 12, 1993.
*26 Carl B. Lyle, II, and C. Bryant Boydstun, Jr., Lyle & Skipper, P.A., St. Petersburg, for appellant.
Thomas C. MacDonald, Jr., and Joseph W. Clark, Shackleford, Farrior, Stallings & Evans, P.A., Tampa, for appellees.
ALTENBERND, Judge.
Edmund D. Wilson appeals a final summary judgment in favor of The Equitable Life Assurance Society ("Equitable") and Sid W. Levy on Mr. Wilson's claim that he was fraudulently induced to resign from his employment with the Pinellas County School Board and to sign an agent's contract with Equitable. We conclude there are material issues of fact that are not eliminated by Mr. Wilson's employment contract with Equitable, and, accordingly, reverse.

I. MR. WILSON'S VERSION OF THE EVENTS[1]
Mr. Wilson was employed as a teacher by the Pinellas County School Board for many years. In 1987, he began to work as a part-time broker selling insurance for Equitable. His son, Kent Wilson, worked full-time for Equitable out of its district office in Clearwater.
In early 1988, Mr. Levy, the regional manager for Equitable, met with Mr. Wilson and encouraged him to come to work full-time for Equitable. Mr. Levy wanted to open a district office in St. Petersburg. He wanted Mr. Wilson's son to manage that office until January 1989, when the two Wilsons would become co-managers. Mr. Wilson, who was approximately 52 years old, explained that he would lose retirement benefits if he retired from teaching at that point in his career. He could only afford to retire if he received retirement credit for five years of out-of-state teaching experience. Mr. Levy assured him that his retirement was not a problem. Mr. Levy repeatedly promised that he or Equitable would arrange for Mr. Wilson to receive the necessary credit for several years of out-of-state teaching experience, even if Equitable was required to pay approximately $150,000 into the Florida Retirement System for that credit.
In May 1988, although Mr. Wilson had not made a final decision to retire from his teaching position, he and his son found suitable space for an office in St. Petersburg. Mr. Levy met with the landlord and agreed to pay the rent on the location until Equitable assumed the lease. He expected that Equitable would assume the lease sometime in the fall. Either Mr. Levy or Equitable paid the telephone bills at this office and provided secretarial staff during the summer. The Wilsons were encouraged to locate full-time agents to work out of their office, and did locate two or three agents, who began work in the summer.
Mr. Wilson worked at his insurance office during the summer without retiring from his position as a teacher. He knew, however, that he would need to make a final decision by late August. During the summer, he met with an official of the school board concerning his retirement and confirmed the amount of the payment that might be necessary for the out-of-state credit.
In late July 1988, Mr. Levy called Mr. Wilson and his son to his office. He wanted a final decision from Mr. Wilson before they attended a corporate meeting in August at Hilton Head, South Carolina. Mr. Levy provided a written projection of Mr. Wilson's salary if he were a successful agency manager. That document is in this record and clearly reflects income based on the performance of other agents. Mr. Levy again assured Mr. Wilson that the retirement was a "done deal." He asked Mr. Wilson to sign an initial contract as an agent until Equitable officially made the St. Petersburg office a district office in January. Mr. Wilson signed the contract. He went to the Hilton Head meeting in *27 August, and resigned his teaching position shortly thereafter.
A few days after Mr. Wilson resigned, Mr. Levy announced that he had changed his mind and that he was closing the St. Petersburg office. Written memoranda indicate that he was unable to arrange a free retirement credit for Mr. Wilson. When Mr. Wilson demanded that Equitable pay for the retirement, Mr. Levy denied that any agreement existed concerning retirement.
Mr. Wilson hired an attorney to assist him with his grievances. After Mr. Wilson and his attorney met with Equitable corporate officials in Atlanta, Mr. Wilson was fired in February 1989. Mr. Wilson attempted to regain employment as a teacher, but was unable to do so. He and his son are now selling insurance for another insurance company.

II. THE TRIAL COURT PROCEEDINGS
Mr. Wilson initially filed this lawsuit, alleging breach of an oral contract, fraudulent misrepresentation, and intentional infliction of emotional distress. The trial court dismissed the count for breach of an oral contract, and Mr. Wilson did not attempt to reallege those allegations. The amended complaint alleges only fraud and intentional infliction of emotional distress. On a second motion for summary judgment, the trial court granted summary judgment on both of the remaining legal theories. Mr. Wilson has appealed only the summary judgment concerning fraud. Accordingly, we limit our discussion to that theory.
Mr. Wilson maintains that he relied to his detriment on three fraudulent misrepresentations. Foremost, he claims that he relied on Mr. Levy's promise to arrange for his retirement credit with the state retirement system. He next claims that he relied on Mr. Levy's promise to make him a manager or co-manager of an office to be created in St. Petersburg, Florida. Finally, he claims that he relied on Mr. Levy's promise that he would make at least $80,000 annually if he changed jobs.
For purposes of summary judgment, Equitable and Mr. Levy assume the truth of Mr. Wilson's version of these events. The contract which Mr. Wilson signed contains a "Prior Agreements" clause which states:
This Agreement shall supersede any previous agreements between the parties hereto for the employment of the Agent or for any solicitation by the Agent of applications for insurance policies or annuity contracts available from the Society, except that any rights of the Agent thereunder, if existing when this Agreement is entered into, for commissions or service fees based on premiums or considerations on insurance policies or annuity contracts placed thereunder shall not be superseded hereby, nor shall any liens in favor of the Society thereon be removed hereby.
They maintain that this clause is a merger clause and that Mr. Wilson cannot establish justified reliance on these promises because of this contractual agreement. The trial court granted summary judgment on this basis.

III. THESE ALLEGATIONS OF FRAUD ARE NOT FORECLOSED BY THIS employment contract
In Nobles v. Citizens Mortgage Corp., 479 So.2d 822 (Fla. 2d DCA 1985), this court applied the well-established rule that alleged fraudulent misrepresentations may be introduced into evidence to prove fraud notwithstanding a merger clause in a related contract. This court reversed a summary judgment concerning the plaintiff's claim that she was fraudulently induced to sign an employment contract. A similar result occurred in the First District case of Elmore v. Vatrano, 485 So.2d 888 (Fla. 1st DCA 1986).
By contrast, in Saunders Leasing System, Inc. v. Gulf Central Distribution Center, Inc., 513 So.2d 1303 (Fla. 2d DCA 1987), review denied, 520 So.2d 584 (Fla. 1988), we reversed a substantial jury award in a fraud case, in part, because an alleged misrepresentation was not material. We determined as a matter of law that the *28 representation was not material because it had not been included in a specially prepared contract negotiated by the parties' attorneys. Other cases have held that a party cannot maintain an action in fraud if the alleged misrepresentation is explicitly contradictory to a specific and unambiguous provision in a written contract. Acquisition Corp. v. FDIC, 760 F. Supp. 1558 (S.D.Fla. 1991); FDIC v. Hemmerle, 592 So.2d 1110 (Fla. 4th DCA 1991).
Although we can understand why the trial court applied Saunders Leasing in this case, we conclude that Nobles is the controlling precedent. Mr. Wilson's employment contract is Equitable's standard form agreement. Although lengthy, it is not a specially negotiated contract prepared with the advice of counsel. It is an agent's contract with all the usual provisions concerning an agent. It simply has no explicit language discussing or foreclosing the possibility of a future arrangement as an agency manager with a guaranteed salary. This standard form makes no reference to Mr. Wilson's school retirement plan. The "Prior Agreements" clause may merge earlier contracts into this written agreement, but it contains no language barring additional oral promises concerning an agency manager's contract in the future.[2]
There is little question that Mr. Wilson took a leap of faith when he left his teaching career without a written understanding concerning Equitable's obligation to fund his retirement. Especially when one considers the fact that, under the agent's contract, he or Equitable could terminate his employment at any time, it may seem unreasonable for him to rely upon a manager's oral assurance that Equitable would pay the equivalent of nearly two years' salary into his retirement plan. Prior to Besett v. Basnett, 389 So.2d 995 (Fla. 1980), we might have held this reliance to be unreasonable as a matter of law because a diligent employee should be expected to include such a major issue in a written contract before resigning another job. Because the relationship between Wilson and Equitable was relatively amicable, however, and not a relationship "plagued with distrust," we do not have the authority to declare Mr. Wilson's act of faith to be unjustified reliance as a matter of law. See Pieter Bakker Management, Inc. v. First Fed. Sav. & Loan Ass'n, 541 So.2d 1334, 1335 (Fla. 3d DCA), review denied, 549 So.2d 1014 (Fla. 1989).
We note that a statement of future performance, expectation, or promise is frequently insufficient to support a claim of fraud. Sleight v. Sun & Surf Realty, Inc., 410 So.2d 998 (Fla. 3d DCA 1982). This record suggests that the "guaranteed" salary of $80,000 may simply have been a prediction. Mr. Wilson will need to prove that Mr. Levy's promise to undertake the retirement fund payment in the future was made without any intention of performing, or with the positive intention not to perform. Palmer v. Santa Fe Healthcare Systems, 582 So.2d 1234 (Fla. 1st DCA), review denied, 593 So.2d 1052 (Fla. 1991). It is entirely possible that Mr. Wilson will be unable to overcome these difficult issues of proof. These issues were not the basis for summary judgment, however, and they cannot be resolved at this stage in the case.
Reversed and remanded.
FRANK, C.J., and LEHAN, J., concur.
NOTES
[1] The facts described in this opinion are derived from Mr. Wilson's deposition. Mr. Levy's version of these events is not contained in the record. It is likely that Mr. Levy's version is different, but for purposes of summary judgment we must assume the truth of Mr. Wilson's testimony.
[2] We recognize that Nobles v. Citizens Mortgage Corp., 479 So.2d 822 (Fla. 2d DCA 1985), and Elmore v. Vatrano, 485 So.2d 888 (Fla. 1st DCA 1986), allow for the possibility that a discharged employee will fabricate oral representations that allegedly induced him or her to abandon an established job for the new position. We do not need to determine today whether those risks could be eliminated if an employee signed a more precise merger or integration clause that voided all additional promises during negotiations and recognized no other pending or future agreements.