Judith SILVER, Plaintiff,

v.

COUNTRYWIDE HOME LOANS, INC., d/b/a America's Wholesale Lender, Inc., and American Home Loans, LLC, Defendant.

Case No. 09–60885–CIV.

United States District Court, S.D. Florida.

Jan. 13, 2011.

Joshua Adam Bleil, Ticktin Law Group PA, Deerfield Beach, FL, for Plaintiff.

Kimberly A. Leary, William Patrick Heller, Jennifer Caldarelli, Akerman Senterfitt & Eidson, Fort Lauderdale, FL, Eric Shaun Matthew, Akerman Senterfitt, Miami, FL, for Defendant.

### ORDER GRANTING MOTION FOR SUMMARY FINAL JUDGMENT

PATRICIA A. SEITZ, District Judge.

THIS MATTER is before the Court on Defendant Countrywide Home Loans

Inc.'s Motion for Summary Final Judgment [DE 68]. This is a mortgage fraud action. Essentially, Plaintiff claims the Defendant fraudulently induced her to enter into a mortgage and then misled her about a loan modification. The Court has carefully reviewed the parties' papers. Plaintiff's papers are long on rhetoric, but short on proof. Having reviewed the statement of facts not in dispute and Plaintiff's response to the statement and the evidence in the record in the light most favorable to the Plaintiff, her claims are unsupported by any evidence from which a reasonable jury could find in her favor. As set forth more fully below, Defendant is entitled to judgment as a matter of law on all of Plaintiff's claims. Accordingly, the Court will grant Defendant's motion for summary judgment.

## I. BACKGROUND

Plaintiff Judith Silver ("Silver") alleges that she was the victim of a predatory lending scheme perpetrated by the Defendant, Countrywide Home Loans Inc. ("Countrywide"). The essence of her Complaint is that she was fraudulently induced into signing loan documents on terms less favorable than she had negotiated and three years later she was unable to refinance or restructure the terms of the loan and as a result she lost the opportunity to refinance her mortgage with another lender.

Silver is a transactional attorney. [See DE 66-1 "Deposition of Judith Silver" ("Silver Dep.") 6:15–7:7]. Silver has been a member of The Florida Bar since 2000.[1] Silver also is a member of the bars of the states of California, New York and Texas.

### A. The Mortgage Loan

Silver's claims arise from her July 26, 2005 mortgage loan transaction to refinance her residence located at 2136 Northeast 15th Street, Fort Lauderdale, Florida 33304.[2] Silver applied for a fixed interest rate loan. [DE 79-2 at 21–23]. On the loan application, Silver lists her annual income as $318,000.00. [Id.] The market value of the property was listed as $1,100,000.00 and the property was encumbered with $201,423.00 in prior mortgages and liens. [Id.] Countrywide loaned Silver $500,000.00 pursuant to a promissory note ("Mortgage Loan") that was secured by a mortgage of her home.[3] [See DE 1 ("Compl.") ¶ 27]. Silver admits signing the mortgage documents, including the Mortgage Loan, mortgage and loan application. [Silver Dep. 14:13–25; 15:1–2; 24:4–18; 41:7–24; 42:10–12; 42:19–25].

The Mortgage Loan, titled in all capital letters, "ADJUSTABLE RATE NOTE," is a Pay Option Adjustable Rate Mortgage

---

1. See http://www.floridabar.org/names.nsf/0/0D 0E49F2BAACD7AE85256A83006D17A2 last visited January 11, 2011.

2. On the same date that Silver executed the Mortgage Loan and mortgage, July 26, 2005, Silver also executed a home equity line of credit ("HELOC") in the amount of $490,000.00. [DE 67 ¶¶ 9–11]. The HELOC was secured by a mortgage also in the amount of $490, 000, 00, in favor of the Mortgage Electronic Registration System as nominee for America's Wholesale Lender. [Id. ¶ 11]. Silver admits signing the loan documents for the HELOC, specifically the note,

mortgage and loan application. [Silver Dep. 102:24–25; 103:1–22; 109:17–24]. Silver never drew upon the HELOC and Countrywide closed the HELOC on January 27, 2009. [DE 67 ¶ 16].

3. The original lender was America's Wholesale Lender and the brokerage firm was American Home Loans. Both America's Wholesale Lender and American Home Loans are subsidiaries of Countrywide. Countrywide services the loan. The Mortgage Electronic Registration System is listed as the Mortgagee on the Mortgage Loan.

("ARM"). [DE 68–1, Ex. A]. The Mortgage Loan states that the interest rate charged for the first month of the loan would be one (1) percent and that the interest rate would change on October 1, 2005—the date on which Silver's first monthly payment was due—and monthly thereafter. The interest rate is calculated by adding three-and-fifteen-hundredths (3.15) percentage points to the twelve (12) month average annual yield on United States Treasury Securities.

The Mortgage Loan provided Silver with four (4) payment options: fully amortized, fifteen (15) year amortized, interest only, and minimum. The fully amortized payment is the amount necessary to pay the loan off at the maturity date, while the fifteen (15) year amortized payment is the amount necessary to pay the loan off within fifteen (15) years. An interest only payment is the amount necessary to pay only the interest portion of the monthly payment at the then current interest rate. The minimum payment is simply the minimum amount that Countrywide would accept for monthly payments. "If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur." [*Id.* at 5]. When negative amortization occurs, the unpaid interest is added to the principal amount of the loan. The loan balance has a cap of one-hundred fifteen (115) percent of the original principal of the loan. If the loan balance reaches the cap, then the minimum payment is raised to the fully amortized payment amount.

The Mortgage Loan also allowed Silver to pre-pay principal, that is, to make payments of principal before they became due. This was subject to a pre-payment penalty; if in the first year of the mortgage. Silver paid more than twenty (20) percent of the original principal amount of the Mortgage Loan, then she would be subject to a pre-payment penalty, which would require her to pay Countrywide six (6) months interest on the amount paid in excess of twenty (20) percent of the original principal. [DE 68–1 at 8–9]. This pre-payment penalty was set forth in a document titled, in all capital letters, "PREPAYMENT PENALTY ADDENDUM."

In the event of default, Countrywide reserved the right to "accelerate" the Mortgage Loan. Default would occur if Silver did not pay the full amount of each monthly payment. If Countrywide chose to "accelerate" the loan, Silver would have to pay immediately the full amount of unpaid principal and any unpaid interest. [DE 68–1, Ex. A at 3].

### B. Silver Is Unable to Refinance or Restructure the Loan and Defaults

It appears that Silver made her mortgage payments for the next three years. However, in April, 2008, Silver needed a modification on her loan and sought to refinance the loan. Silver avers that Countrywide solicited her to do the refinancing. [Silver Dep. 61:1–10; 62:10–11]. Silver believed that she was approved for refinancing. (*Id.* 63:1–3; Silver Aff. 3:18). However, Silver does not recall submitting an application to refinance. [Silver Dep. 60:20–25]. Also, Silver claims that she received other offers to refinance,[4] but stayed with Countrywide because Countrywide assured her that her mortgage would be refinanced.[5] [DE 78 at 5]. Countrywide did not refinance Silver's Mortgage.

---

4. "Discussions with brokers on the phone where you would give them your basic layout and they'd say, you know, we can offer you this or this or this or you have these options and so on." [Silver Dep. 155:15–18].

5. Silver has no documentation that would substantiate any offer to refinance, including

In November, 2008, Silver alleges that Countrywide solicited her to restructure the Mortgage Loan. An agent of Countrywide allegedly told Silver that she needed to default on the loan to be eligible to restructure. [Silver Dep. 69:1–2]. The parties entered into a forbearance agreement, whereby Countrywide agreed to suspend Silver's mortgage payments for the months of December, 2008 through February, 2009 ("Suspended Payment Period"), with regularly scheduled payments to recommence on March 1, 2009. [DE 83–2]. During the Suspended Payment Period, Countrywide agreed to review the Mortgage Loan to determine whether it would offer to modify the Mortgage Loan or offer some other form of payment assistance. [Id.] Countrywide agreed that no late fees would be assessed and only if her account became delinquent would late charges be assessed. [Id.] Additionally, Countrywide would not report the status of the loan to any credit reporting agency during the Suspended Payment Period, but that if she failed to make any required payment to Countrywide after the Suspended Payment Period, that Countrywide would report her loan as delinquent.

By letter dated February 19, 2009, Countrywide denied Silver's request to restructure her loan. [DE 66–2 at 15]. Near the end of February, Countrywide notified Silver that the Suspended Payment Period had come to an end and that she was required to bring her account current. [Id. at 13]. By letter dated March 5, 2009, Countrywide notified Silver that she was in default on the loan, and that if she did not cure the default by April 4, 2009, that Countrywide would accelerate the loan thereby making the full amount remaining on the Mortgage Loan due in full. [Id. at 17–18].

### C. Silver Files Suit

In May, 2009, Silver filed an eleven (11) count lawsuit against Countrywide alleging: (1) Breach of Fiduciary Duty; (2) Fraud; (3) Conspiracy to Defraud; (4) Breach of Contract; (5) Breach of the Implied Covenant of Good Faith and Fair Dealing; (6) violation of the Truth in Lending Act ("TILA"); (7) violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"); (8) Lack of Standing; (9) Negligence; (10) Florida RICO; and (11) Rescission. [See Compl. ¶¶ 43–116]. Countrywide has moved for summary final judgment as to all of Silver's claims.

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 991 (11th Cir.2001). Once the moving party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts

the claim that Countrywide approved her for refinancing. [Silver Dep. 155:19–21]. According to Silver, an unspecified representative of Countrywide contacted Silver's title company, North Beach Title, to arrange a May 1, 2008 closing on the loan refinancing. [Id. 85:19–22]. Silver needed a week extension and asked her Title Company to change

the closing date to May 8, 2008. Silver does not know whether the closing date was rescheduled from May 1 to May 8, but presumed that her Title Company followed her instructions. [Id. 85:18–20]. Over the next week, Countrywide requested additional documentation from Silver. [Id. 87:24–88:16].

showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

In opposing a motion for summary judgment, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. *See* Fed.R.Civ.P. 56(c), (e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A mere "scintilla" of evidence supporting the opposing party's position will not suffice; instead, there must be an adequate showing that it is able to produce evidence sufficient for a reasonable jury to find for that party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (*quoting Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505).

## III. DISCUSSION

The thrust of Silver's case is that Countrywide engaged in "bait and switch" tactics whereby Countrywide induced her into applying for a mortgage with promises of low interest rates, low monthly payments and a fixed interest rate, but then changed the terms of the mortgage at closing.[6] Using allegedly false representations, as well as allegedly high-pressure tactics, Silver claims that Countrywide forced her to sign loan documents without being permitted to read them. Additionally, Silver alleges that Countrywide falsified her income on the loan documents. Furthermore, Silver avers that Countrywide misrepresented the terms in the documents Silver was signing, and did not provide her with a copy of all of the documents.

However, viewing the record and making all factual inferences therefrom in the light most favorable to Silver, the evidence shows that the terms of the loan were fully disclosed and Silver signed every document. While Silver claims she did not understand many of the documents, did not have time to review the documents, and no one explained the terms to her, she admits that she was instructed not to sign any documents at the closing if she had questions about them. [Silver Dep. 49:4–14; 50:17–25; 51:1–18]. Moreover, it is clear from the record that when she did have questions regarding the loan documents, she made notations on the documents. [*Id.* 49:4–14; 99:22–100:1]. That said, however, Silver testified that she did not review all of the documents at closing, and for example, testified she did not read the Mortgage Loan or mortgage. [*See id.* 14:13–25; 15:1–2; 24:4–18; 41:7–24; 42:10–12; 42:19–25; 45:24–25; 46:1; 49:4–14; 50:17–21; 50:17–25; 51:1–18; 102:24–25; 103:1–22; 109:17–24]. Nevertheless, Silver signed every document.[7]

---

**6.** Silver further alleges that Countrywide charged unfair and excessive fees and expenses for the services rendered.

**7.** Silver's deposition testimony appears to equivocate only regarding whether she recalls signing two documents—the Good Faith Estimate and Settlement Statement—or whether her signature was forged. [Silver Dep. 55:12–16, 23–25; 56:23–25; 57:1–4]. For purposes of summary judgment, these two documents do not appear relevant to the

### A. Causes of Action

In Silver's Opposition to the Motion for Summary Final Judgment, she has withdrawn her claims for TILA (Count VI), Lack of Standing (Count VIII) and Rescission (Count XI). [DE 78 at 2]. For ease of reference, the Court has grouped Silver's remaining claims into the following: (1) Breach of Fiduciary Duty and Negligence (Counts I and IX); (2) Fraud, Conspiracy to Defraud, and violation of FDUTPA (Counts II, III and VII); (3) Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing (Counts IV and V); and (4) Florida RICO (Count X). The Court will address these in turn.

#### 1. Breach of Fiduciary Duty and Negligence (Counts I and IX)

##### a. Breach of Fiduciary Duty

Countrywide maintains that it is entitled to summary judgment on the breach of fiduciary duty count because Countrywide has no fiduciary relationship with Silver since Florida law[8] does not recognize a fiduciary relationship between a borrower and a lender. [DE 68 at 6]. Breach of fiduciary duty requires proof of (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) damages prox-

imately caused by the breach. *Gracey v. Eaker*, 837 So.2d 348 (Fla.2002). Under Florida law, a fiduciary relationship exists where confidence is reposed by one party and a trust accepted by the other. *Doe v. Evans*, 814 So.2d 370, 374 (Fla.2002).

The general rule is that the relationship between a bank and its borrower is that of a creditor-debtor and that a bank owes the borrower no fiduciary duty. *See McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1226 n. 13 (11th Cir.2002) ("there is no presumed fiduciary relationship between a lender and a borrower") (applying Florida law). Under special circumstances not present here,[9] a bank may owe a duty to disclose certain material information "peculiarly within its knowledge, and not otherwise available to the customer." *Barnett Bank of West Florida v. Hooper*, 498 So.2d 923, 925 (Fla.1986). However, the mere communication of confidential information between the borrower and the bank is not enough to establish such a fiduciary obligation.

Silver states that she established a relationship of trust and confidence with Countrywide because she "developed a friendship with the lender's agent" while negotiating the mortgage at issue in this action through thirty (30) to forty (40)

---

causes of action Silver asserts in her Complaint.

**8.** This matter is before the Court on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331 based on Silver's claim for violation of her disclosure rights under TILA.

**9.** Where a bank makes representations to one customer regarding the creditworthiness of another customer, the bank is be bound to use the skill and expertise with which they hold themselves out to the public. In the Florida cases that Silver cites to support her assertion that Countrywide owed her a fiduciary duty, the banks had a pecuniary interest in transactions between two of its customers, and there was a conflict between the bank's obligation

to disclose information that would be helpful to one customer with the duty of non-disclosure to another. In those cases, the courts found that a fiduciary duty arose when the bank stands to benefit from the non-disclosure of material information to one of its customers. For example, in *Barnett Bank of West Florida v. Hooper*, 498 So.2d 923 (Fla. 1986), after learning that one of its customers, Hosner, was involved in a check-kiting scheme, the bank loaned Hooper money for investment in a tax shelter venture of Hosner. The proceeds of the loan from Hooper to Hosner were deposited into Hosner's account at the bank, and the bank then set off the outstanding obligations on Hosner's account. The bank's liability was premised on its pecuniary interest in the transaction.

telephone conversations. [DE 80 at 4 ¶ 1]. Furthermore, Silver claims that she placed her trust and confidence in Countrywide and believed that Countrywide would provide her with a loan that was in her best interest. [Compl. ¶ 46]. Instead, Silver alleges that Countrywide steered her into a risky and financially complex Mortgage Loan that was unsuitable for her needs. [*See id.* ¶¶ 47, 96, 98].

■ Here, there is no record evidence that demonstrates anything other than an arms-length transaction. Silver's "proof," *i.e.*, that she had a number of telephone conversations with Countrywide's agent, is insufficient to establish a fiduciary relationship. *See Motorcity of Jacksonville, Ltd. By and Through Motorcity of Jacksonville, Inc. v. Southeast Bank, N.A.,* 83 F.3d 1317, 1340 n. 21 (11th Cir.1996) (long-standing relationship does not transform the lender-borrower relationship into fiduciary one) (abrogated on other grounds by *Hess v. FDIC,* 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997)). Although Silver alleges that she placed her trust and confidence in Countrywide, one may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created. Accordingly, no issues of material fact exist as to Silver's breach of fiduciary duty claim and Countrywide is entitled to judgment as a matter of law.

### b. Negligence

■ Silver alleges that Countrywide was negligent in that it had the duty to employ competent mortgage servicing and mortgage brokering techniques, including but not limited to protecting Silver's financial interests, and that Countrywide breached that duty by making negligent misrepresentations and fraudulently inducing Silver to enter into the mortgage. To prevail on a claim for negligence, Silver must establish that (1) Countrywide owed a duty to protect Silver from a particular injury or damage; (2) Countrywide breached this duty; (3) Countrywide's breach was the proximate cause of injury or damage to Silver; and (4) Silver suffered damages caused by the breach. *See, e.g., Curd v. Mosaic Fertilizer, LLC,* 39 So.3d 1216, 1227 (Fla.2010).

Silver has not identified any duty, apart from contractual duties, that Countrywide owed her. First, there is no tort duty to process loans competently. The relationship is contractual; there is either a breach of that contract or not. As for allegations of false statements, the cause of action does not arise under negligence, but rather sounds in fraud. However, Silver does not allege fraudulent or negligent misrepresentation.

■ The economic loss rule bars a cause of action in tort where a defendant has not committed a breach of duty apart from a breach of contract. *Indem. Ins. Co. v. Am. Aviation, Inc.,* 891 So.2d 532, 536 (Fla.2004). Therefore, parties in privity generally are prohibited from recovering in tort for economic damages.[10] *Id.* at

---

10. Exceptions to the contractual privity economic loss rule involve torts with freestanding causes of action, including professional malpractice, fraudulent inducement, and negligent misrepresentation. *See, e.g., Greenfield v. Manor Care, Inc.,* 705 So.2d 926, 932 (Fla. 4th DCA 1997) (breach of fiduciary duty claim was not barred by economic loss doctrine where fiduciary duty was independent of the contract); *HTP v. Lineas Aereas Costarricenses, S.A.,* 685 So.2d at 1239 (fraudulent inducement is an independent tort from a breach of contract claim, as it requires proof of facts separate and distinct from the breach and is not barred by the economic loss doctrine). *But see, Clayton v. State Farm Mut. Auto., Ins.*

537. Here, the parties relationship was contractual, which precludes a claim for negligence under the contract. As Silver fails to establish that Countrywide owed any duty not arising under contract, Countrywide is entitled to judgment as a matter of law on the negligence claim.

### 2. *Fraud, Conspiracy to Defraud, and Violation of FDUTPA (Counts II, III and VII)*

Silver's fraud-based claims— Fraud (Count II), Conspiracy to Defraud (Counts III) and FDUTPA (Count VII)— all hinge on the same premise: Silver did not know the terms of the loan documents she was signing either because the terms were different than those she negotiated and she did not have time to review all the loan documents, or she did not understand the loan terms and no one explained them to her, The fraud claims allege that Countrywide inflated Silver's annual income on the loan application; that Silver applied for a fixed interest rate loan but was never told she was being placed into an adjustable rate mortgage; that Countrywide failed to disclose the risk of negative amortization; that Countrywide falsely told Silver there was no prepayment penalty; [11] and that Countrywide falsely told Silver "the fact that the loan was a good deal for her." [Compl. ¶ 57].

While Silver acknowledges she voluntarily signed the loan documents, her papers complain "the loan terms were not clear at all" and "what is vital is that neither Defendant's agent, nor anyone at closing, explained this loan to [her]." [DE 78 at 1, 6, 7]. Any claim that information was concealed or not disclosed fails, however, because as a matter of law, Silver is deemed to have knowledge of documents she voluntarily signed. Furthermore, the misrepresentations upon which she has claimed reliance are contradicted by the very terms of the agreement she signed. Moreover, Silver has offered no facts or a signed written instrument documenting the terms she alleges she should have received. Accordingly, as a matter of law, Silver's claims are barred by the statute of frauds because there is a signed written instrument setting forth the terms she claims were misrepresented. Silver may not strike a better deal for herself simply by arguing that the Court should incorporate into a contract matters that may have been the subject of pre-contract negotiations but which are refuted by the terms that actually were reduced to writing. As discussed more fully below, summary judgment is appropriate on all of Silver's fraud-based claims.

#### a. *Fraud*

A claim for fraud must identify: (1) the precise misrepresentations made; (2) the time and place of, and person(s) responsible for the misrepresentations; (3) the content and manner in which the statements misled Silver; and (4) what Countrywide gained by the alleged fraud. *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316–17 (11th Cir.2007). Countrywide argues that Silver cannot as a matter of law have been deceived or defrauded by terms fully disclosed, and likewise, she could not have relied upon any information contrary to the signed written agreement. Finally, Countrywide maintains that Florida's statute of frauds

---

*Co.*, 729 So.2d 1012, 1014 (Fla. 3d DCA 1999) (economic loss rule bars fraudulent misrepresentation claim where it is inseparable from parties' agreement).

11. Silver does not claim that she was penalized for making a pre-payment, but rather, complains that she wanted a loan with no pre-payment penalty. [Silver Dep. 16:8–15].

prohibits exactly these sorts of contentions. *See* Fla. Stat. § 687.0304(2).

Silver's fraud claims are based on the contention that Countrywide made a number of fraudulent misrepresentations upon which Silver relied to her detriment in entering the Mortgage Loan in 2005.[12] However, the alleged misrepresentations do not constitute actionable fraud, Each representation is discussed below.

*(1) Reliance upon oral statements at variance with the written documents was not reasonable as a matter of law.*

Silver suggests she is not bound by documents she signed because she did not understand the terms and that Countrywide had a duty to explain the terms of the Mortgage Loan and not conceal any of the provisions. However, it is undisputed that Silver signed the Mortgage Loan and was told not to sign any documents that she did not understand. "[P]arties who sign contracts will be bound by them regardless of whether they have read them or understood them." *MCC–Marble Ceramic Center, Inc. v. Ceramica Nuova d'Agostino, S.p.A.,* 144 F.3d 1384, 1387 n. 9 (11th Cir.1998); *see Reliable Finance Co. v. Axon,* 336 So.2d 1271, 1273–74 (Fla. 2d DCA 1976) (finding a party to a writing cannot deny its contents on the ground that he or she signed it without reading it first); *Linville v. Ginn Real Estate Company, LLC,* 697 F.Supp.2d 1302, 1308–9 (M.D.Fla.2010) ("A party who signs an instrument is presumed to know its contents. . . . He cannot avoid his obligations thereunder by alleging that he did not read the contract, or that the terms were not explained to him, or that he did not understand the provisions") (citing *Benoay v. E.F. Hutton & Co.,* 699 F.Supp. 1523,

1529 (S.D.Fla.1988)). Thus, any claims that she is not bound by the terms of the Mortgage Loan or was deceived by terms fully disclosed but not explained to her, fail as a matter of law.

Additionally, Florida courts have found that claims for fraud were barred when the alleged misrepresentation explicitly contradict an unambiguous provision in a written contract. *See Wilson v. Equitable Life Assurance Soc'y,* 622 So.2d 25, 28 (Fla. 2d DCA 1993); *see also, Garcia v. Santa Maria Resort, Inc.,* 528 F.Supp.2d 1283, 1295 (S.D.Fla.2007) ("reliance upon oral statements which were at variance with the written documents were not reasonable as a matter of law"). The misrepresentations and false statements upon which Silver claims reliance and subsequent damage are contradicted by the provisions of the Mortgage Loan she signed. Any claim of fraud based upon oral representations allegedly made to induce reliance fails where the alleged misrepresentations are at variance with the clear, written terms of the agreement in issue. *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv.,* 556 F.3d 1232, 1240 (11th Cir.2009) (citing *Rose v. ADT Sec. Servs. Inc.,* 989 So.2d 1244, 1247 (Fla. 1st DCA 2008)). Thus, she cannot legally have been deceived or defrauded by terms fully disclosed; any reliance upon alleged oral misrepresentations that are expressly contradicted by the terms of the Mortgage Loan is objectively unreasonable as a matter of law. *Garcia,* 528 F.Supp.2d at 1295; *see also Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1428 (S.D.Fla. 1996); *Acquisition Corp. of Am. v. FDIC,* 760 F.Supp. 1558, 1561 n. 6 (S.D.Fla.1991). Moreover, there is no record evidence that

---

**12.** Silver also claims that Countrywide induced her into accepting a refinancing offer in 2008, but then alleges that Countrywide never intended to refinance her loan. However, no facts were alleged, nor evidence presented as to the fourth element, what Countrywide intended to gain through the alleged 2008 refinancing fraud.

promises were made to induce reliance beyond matters covered in the subject contract. Nor would evidence be admissible to vary the written document.

*(2) Statute of frauds bars parol evidence.*

■■■■■ Any representations were required to be in writing in order to be enforceable because, under the statute of frauds, parol evidence is not admissible to contradict the unequivocal written terms of an otherwise unambiguous credit agreement. FLA. STAT. § 687.0304(2).[13] Simply put, parol evidence cannot be admitted to create an ambiguity where none otherwise exists. *See Eboni Beauty Acad. v. AmSouth Bank of Fla.,* 761 So.2d 481, 482 (Fla. 5th DCA 2000) (plaintiff's claim that she would not have entered into contract absent oral promise for loan was barred by statute of frauds). Silver signed the Mortgage Loan that clearly outlined the terms of the loan. Since the statute of frauds bars any claim that is either directly or indirectly based on alleged oral representations not contained in an unambiguous written agreement, the fraud claims fail on this basis as well.

*(3) Silver is responsible for the representations in her loan application.*

■■■ In her Complaint Silver alleges that she stated by telephone that her income was $125,000.00, but that Countrywide inflated Silver's annual income on the loan application to $318,000.00. [Compl. ¶ 57(a); DE 78 at 9]. It is undisputed that Silver signed the Uniform Residential Loan Application on which her income is allegedly misrepresented, and she initialed each page of the Uniform Residential Loan Application. [DE 79–2 at 22]. Moreover,

as a matter of law, Silver is responsible for the representations on her loan application. *See Infante v. Bank of Am. Corp.,* 680 F.Supp.2d 1298, 1303 (S.D.Fla.2009). Thus any misrepresentation was her own and Countrywide may not be held liable.

■■■ Furthermore, notwithstanding the undisputed facts and black-letter law, to constitute actionable fraud, Silver must have relied upon the alleged misrepresentation. However, Silver testified at deposition that she did not rely upon the annual income in her loan application when she signed the application. [Silver Dep. 37:15–19]. Thus, she took no action based upon the alleged misrepresentation and therefore this statement cannot support a claim for fraud.

*(4) Any representation that the loan was a good deal does not support fraud.*

■■■ A plaintiff may not maintain an action for fraud based on misrepresentations that were in the form of opinions and not statements of existing, material facts. *Wasser v. Sasoni,* 652 So.2d 411 (Fla. 3d DCA 1995) (seller's representation that an apartment building was "'a very good building' requiring 'normal type of maintenance'" was merely puffing and not a fraudulent misrepresentation). A statement of opinion, such as occurs in "puffing," is not a statement of fact, but is one of opinion. "Puffing" is not to be taken seriously, is not to be relied upon, and is not binding as a legal obligation or promise. *Id.* at 412.

■■■ Silver claims that she was induced into accepting the loan based upon fraudulent misrepresentations that "the loan was a good deal for her," as well as "that the value of the Plaintiff's home would contin-

---

**13.** "A debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."

ue to rise and she would not have a problem refinancing." [Compl. ¶¶ 32, 57(e) ]. These are clearly statements of opinion and projections about future events, and as such do not constitute statements of existing material fact, which is a prerequisite for actionable fraud.[14]

### b. Violation of FDUTPA

 In order to prevail on a FDUTPA claim, a consumer must establish: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006). "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances to the consumer's detriment." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir.2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla.2003)). No such deception occurred here because the loan terms were disclosed in the loan documents signed at closing. Additionally, Silver, by her own admission, signed the loan documents containing the terms she now complains about. Moreover, she admitted at deposition that she was instructed not to sign any documents that she did not understand. No reasonable consumer would be deceived in this situation. Accordingly, Countrywide is entitled to judgment as a matter of law on Silver's FDUTPA claim.

### c. Conspiracy to Defraud

 Countrywide argues that Silver cannot prevail on her claim for conspiracy to defraud because she has failed to establish any of the necessary elements. In Florida, "[a] civil conspiracy requires: (a)

an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. 3d DCA 1997). "Additionally, an actionable conspiracy requires an actionable underlying tort or wrong." *Id.*

As to the first element, Silver asserts that "Countrywide had an agreement with their agents to produce risky subprime loans" as evidenced by the "mortgage circulars" distributed to agents that "illustrated monetary incentives" for the sales of different loans. [Compl. ¶ 64]. She further alleges that Countrywide "encouraged its employees and agents to breach their fiduciary duty to borrowers, including the Plaintiff." [*Id.* ¶ 65]. Yet, the record is completely devoid of any facts demonstrating Countrywide entered into an agreement with its agents to defraud Silver or that Countrywide or its agents undertook any acts in furtherance of the alleged conspiracy. The "mortgage circular" is not part of the record evidence, nor has Silver demonstrated how a "mortgage circular" constitutes any type of agreement between Countrywide and those with whom it is alleged to have committed the conspiracy to defraud. Turning to the second element, as discussed above, (*supra* (III)(A)(2)(a)), as a matter of law, Silver has no legally sustainable fraud claim against Countrywide. Therefore, the requirement of an actionable underlying tort or wrong is not present. As a result, the Court finds no issues of material fact exist as to Silver's civil conspiracy claim and

---

14. It is noteworthy that Silver never set forth with the required particularities for fraud, *i.e.*, the who, what, when, where, and how of the allegedly false statements. The allegedly false statements discussed in this opinion are based upon a review of the record evidence in the light most favorable to Silver.

**1344**

Countrywide is entitled to judgment as a matter of law.

3. *Breach of Contract/Failure to Act in Good Faith and Breach of the Implied Covenant of Good Faith and Fair Dealing (Counts IV and V)*

 Counts IV and V allege Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing. Silver's Complaint and papers lump several events together and blur the applicable law. She argues that Countrywide breached the Mortgage Loan agreement because it acted in bad faith in servicing her Mortgage Loan, and maintains Countrywide breached the implied covenant of good faith and fair dealing because it breached the forbearance agreement.[15] Specifically, she alleges that Countrywide committed contractual breaches due to its alleged failure to act in good faith because the terms of the Mortgage Loan were unclear and "by making continuous misrepresentations regarding the refinancing and restructuring of the loan." [DE 78 at 12; Compl. ¶¶ 70–72]. Additionally, in her opposition to Countrywide's motion for summary judgment, Silver asserts her position that this Count pertains to Countrywide's alleged breach of the forbearance agreement. [DE 78 at 12].

 To prevail on a claim for breach of contract under Florida law, Silver must prove (1) the existence of a contract, (2) a material breach of that contract, and (3) damages resulting from that breach, *Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir.2009). To prove the existence of a contract, Silver must establish that there was (1) an offer, (2) acceptance, (3) consideration, and (4) sufficient specification of the essential terms, *Id.* Additionally, under Florida law, every contract has an implied covenant of good faith and fair dealing. *Burger King Corp. v. C.R. Weaver*, 169 F.3d 1310, 1315 (11th Cir.1999). A duty of good faith "is not an abstract and independent term of a contract" but must relate to performance of an express contractual obligation. *Beach Street Bikes, Inc. v. Bourgett's Bike Works, Inc.*, 900 So.2d 697, 700 (Fla. 5th DCA 2005). Therefore, breach of the implied covenant cannot be based on general allegations of "bad faith," but rather, it must be based upon the failed performance of an express term of the contract. *Centurion Air Cargo, Inc. v. United Parcel Serv. Co.*, 420 F.3d 1146, 1151–52 (11th Cir. 2005); *Snow v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 896 So.2d 787, 792 (Fla. 2d DCA 2005) ("There can be no cause of action for a breach of the implied covenant absent an allegation that an express term of the contract has been breached.") (internal quotations omitted).

Viewing the record and drawing all inferences in the light most favorable to Silver, it appears that she believes that Countrywide breached the forbearance agreement when it "sent an acceleration letter, assessed additional late fees and late charges[,] and denied her for any [*sic*] additional assistance without asking for a single document or proof of her financial condition." [DE 78 at 12]. Howev-

---

**15.** It appears that Silver alleges Countrywide committed three (3) separate contract breaches because it acted in bad faith when it (1) "provided a mortgage that did not clearly detail the terms and fully disclose the acceleration clause in the loan"; (2) "solicited the Homeowner to refinance the mortgage in April, 2008, requested all of her financial documentation, and qualified her for a refinance, set up a closing date, and then disappeared on the day of the closing"; and, (3) "solicited the Homeowner to restructure the mortgage in November, 2008, forced her to sign a forbearance agreement, breached that forbearance agreement, did not ask for any documentation to determine whether she qualified, and then denied her a restructuring." [DE 78 at 12].

er, pursuant to the forbearance agreement, Silver was required to recommence making her mortgage payments on March 1, 2009. [DE 83–2]. Accordingly, when Silver failed to make the March 1, 2009 payment, Countrywide notified Silver that she was in default on the loan, and that if she did not cure the default it would accelerate the loan. Accelerating the loan upon default after the Suspended Payment Period had come to an end did not breach the forbearance agreement. Furthermore, although Countrywide agreed that no late fees would be assessed, it was only if her account was not delinquent. [*Id.*] Thus, assessing late fees after Silver's account became delinquent did not breach the forbearance agreement. Finally, simply because Countrywide denied Silver's request to restructure her mortgage loan, it did not breach the forbearance agreement, and it was under no obligation to ask for documents or proof of her financial condition before it did so. Therefore, the Court finds that, as a matter of law, Countrywide did not breach the forbearance agreement.

■■■ Aside from a claimed breach of the forbearance agreement, Silver does not allege breach of an express contractual term, but instead avers that Countrywide acted in bad faith by mishandling the Mortgage Loan, apparently when it failed to restructure or modify her loan. [DE 78 at 11]. However, Countrywide had no contractual obligation to restructure or modify Silver's loan. Nor does Silver allege such an express contractual provision. Thus, there was no breach of contract based on these events. Finally, Silver's failure to identify any express contractual provision in the 2005 Mortgage Loan that Countrywide failed to perform in good faith, forecloses any claim for breach of the implied covenant of good faith and fair dealing for that contract. Therefore, De-

fendant is entitled to judgment as a matter of law on the contract claims.

### 4. *Florida RICO (Count X)*

The Florida RICO statute essentially makes it unlawful for an enterprise to profit by engaging in a pattern of criminal activity. *See* Fla. Stat. §§ 772.101 *et seq.* Silver failed to file a Civil RICO Case Statement pursuant to S.D. Fla. Local Rule 12.1, and the claim is deficient in that regard. Second, Silver has failed to make even a minimal showing as to how Countrywide committed acts in violation of the statute. Rather, the Complaint states, "[t]he prohibited acts committed by COUNTRYWIDE are enumerated in Florida Statutes § 817.54." and "[t]his vicious pattern of fraud and the reinvestment of proceeds from that fraud are enumerated in multiple jurisdiction by multiple plaintiffs. Most notably, the Attorneys General of the States of California, Illinois, Florida, Massachusetts, and seven others." [Compl. ¶¶ 102–103]. While that statement may be true, it certainly falls short of alleging facts supporting a Florida RICO claim, particularly with regards to Silver's loan. In response to Countrywide's Motion, Silver merely directs the Court to consider an untimely filed Civil RICO statement, which has been stricken as untimely filed. [*See* DE 81, 88]. Such is not evidence. Having considered Silver's Florida RICO claim and the record, the Court finds there are no genuine issues of material fact and Countrywide is entitled to judgment as a matter of law.

### IV. CONCLUSION

For the reasons set forth above Countrywide is entitled to judgment as a matter of law on all of Silver's claims. Accordingly, it is

ORDERED that

(1) Countrywide's Motion for Summary Final Judgment [DE 68] is GRANTED.

(2) The Court shall enter separate judgment in favor of Countrywide.

(3) AH pending motions not otherwise ruled upon are DENIED AS MOOT.

(4) This CASE IS CLOSED.